UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIS HORTON, and LUIS SAEZ,

                        Plaintiffs,

      v.                                  1:14-CV-1050

ERIC GUILLOT,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## **DECISION AND ORDER**

Before the Court is Defendant's motion for summary judgment and to preclude testimony from Plaintiff's rebuttal experts in this defamation action. See dkt. # 62. The parties have briefed the issues and the Court has determined to resolve the matter without oral argument.

**I.      Background**

This case concerns the aftermath of the Travers Stakes, contested on August 24, 2013 at Saratoga Race Course. Plaintiff Luis Saez rode a horse named Will Take Charge to victory, narrowly defeating Moreno. Defendant Eric Guillot trained Moreno. Defendant's brother watched a replay of the race. He concluded that Saez had used an illegal device to shock Will Take Charge into running faster. He reported that belief to his brother. Defendant then reported his suspicion to the New York State Gaming Commission, which conducted an investigation. Guillot also brought his allegations to the press. The investigation eventually cleared Saez and Will Take Charge's owner, Plaintiff Willis Horton, of any wrongdoing. Horton and Saez then sued Defendant for defamation, alleging that Guillot's allegations

diminished the value of Will Take Charge and limited Saez's earnings as a jockey. At the end of discovery, Defendant filed the instant motion for summary judgment and to preclude the testimony of Plaintiff's rebuttal experts under the Supreme Court's Daubert standard.

## II.	Legal Standard

Defendant seeks summary judgment. It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

**III.     Discussion**

   **A. Summary Judgment**

The Court will first address Defendant's argument that summary judgment is appropriate on Plaintiffs' defamation claims. The Court takes this approach because the Defendant's motion for summary judgment on the underlying claims does not rely on any expert opinion on damages, but rather on the facts supporting the defamation claim. If the Court were to grant summary judgment on the defamation claim, Defendant's arguments on the admissibility of expert testimony–which focuses on how damages could be proved–would be moot. In that sense, Defendant's expert-testimony motion–which is essentially a motion *in limine*–would have been more sensibly brought at the time of trial.[1]

   **a. The Law of Defamation**

Plaintiffs allege defamation by the Defendant in his allegations concerning the Travers Stakes. In New York, defamation is "the making of a false statement which tends to 'expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly

---

[1] Defendant argues that the Court should strike Plaintiff's opposition brief as violative of Local Rule 10.1, which provides that "extensive footnotes must not be used to circumvent page limitations." L.R. 10.1(5). Defendant points out that the Court struck Plaintiffs' original opposition papers for exceeding the page limits on briefing and ordered that they be re-filed in accordance with the rules. See dkt. # 71. Defendant contends that Plaintiffs simply re-filed their original brief and converted text footnotes to comply with the page limits. Defendant argues that the Court should punish this conduct by striking the Plaintiffs' opposition papers. The Court will deny this request. Defendant has cited no prejudice from the Plaintiff's briefing, and the Court prefers to decide motions on their merits, rather than because one side seizes a procedural advantage. Moreover, the Defendant's pleadings are partly responsible for the length of the response, since Defendant insisted on including in his pleading a *motion in limine* (the Daubert motion) unrelated to the motion for summary judgment.

intercourse in society.'" Foster v. Churchill, 87 N.Y.2d 744, 751, 665 N.E.2d 153, 157 (N.Y. 1996) (quoting Rinaldi v. Holt, Rinehart & Winston, 42 N.Y.2d 369,379 (1977)).  A Plaintiff claiming defamation must prove: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm[.]" Stepanow v. Dow Jones & Co., Inc., 120 A.D.3d 28, 34, 987 N.Y.S.2d 37, 41-42 (1st Dept. 2014) (citing Dillon v. City of New York, 261 A.D.2d 34, 38, 704 N.Y.S. 2d 1 (1st Dept. 2012)).  "Generally, only statements of fact can be defamatory because statements of pure opinion cannot be proven untrue[.]" Thomas H. v. Paul B., 18 N.Y.3d 580, 584, 965 N.E.2d 437, 440 (2012).  "A verbal utterance that inaccurately accuses a person of a serious crime can be slander per se."  Id.

**b. Allegedly Defamatory Statements**

Plaintiffs point to a number of allegedly defamatory statements made to reporters and published in various periodicals.[2]  An Albany Times-Union story, published on August 31, 2013, reported that "Travers runner-up says winner cheated."  See Exh. 0 to Affidavit of Shannon O'Connor, dkt. # 62-16.  The paper reported that Defendant "alleges Saez was carrying an electrical device in his hand during the race, and then dropped it after Will Take Charge beat Moreno by a nose."  Id.  The paper quoted Guillot that "[t]he gaming

---

[2]Defendant contends that Plaintiff alleges defamation in Defendant's report to the New York Gaming Commission concerned Saez's alleged use of an illegal device during the Travers Stakes.  Defendant's Statement of Material Facts ("Defendant's Statement"), dkt. # 62-25, at ¶ 10.  Plaintiffs deny that their defamation claim includes any statements to the Gaming Commission.  Plaintiffs' Response to Defendant's Statement of Material Facts ("Plaintiffs' Response"), dkt. # 72-10, at ¶ 10.  Though Plaintiffs' Brief appears to point to Defendant's complaints to regulatory bodies as defamatory, the Court will accept this representation and consider only the statements not made to regulators.  See Plaintiff's Brief in Opposition to Defendants' Motion ("Plaintiff's Brief"), dkt. # 72, at 2.

- 4 -

commission is working on it[.]" Id.  He had "brought them the video.  I showed it to 100 people, and there ain't been one person to deny it yet.  You see a blurry, black device go from the right hand to the left, and then he drops it."[3]  Id.  A September 7, 2013 article in the Daily Racing Form reported that "Will Take Charge's jockey accused by rival trainer of using electrical device in Travers[.]"  See Exh. Q to O'Connor Affidavit, dkt. # 62-18.  The story related that the New York State Gaming Commission was investigating the charge, which Saez had denied through his agent.  Id.  Guillot told that paper that "the New York stewards told him 'they would have to go through the proper procedures, which they're doing right now.'"  Id.  He claimed that "[t]o me, the horse was dead in the water four jumps from the wire when he hit him with the machine, he surged . . . pretty suspicious when they had a jock change coming off a second place in the Jim Dandy."  Id.  The story noted that "Guillot is known to be a charachter who says outlandish things," and that he had made a voodoo doll of a rival trainer.  Id.  The Daily News quoted Defendant as stating that "[o]ne thing I have with all the [stuff] I talk is integrity . . . integrity goes a long way with me."  Id.  Horse racing "needs it."  Id.  Guillot predicted that "[t]his will be a black eye to the industry.  But I think if we all clean up the rats and flush them out, we'll have no more problems in the future.  I feel sorry for the industry and the gamblers, the people that bet on [Moreno] at 30-1, for it to come to this."  Id.

On September 15, 2013, the Daily News reported that "Trainer Eric Guillot alleges jockey Luis Saez used device on Will Take Charge, sticks to story."  See Exh. R to O'Connor affidavit, dkt. # 62-19.  Discussing the upcoming Pennsylvania Derby, Guillot predicted that

---

[3]The same quotation from Defendant appeared in the New York Daily News on August 31, 2013.  See Exh. P to O'Connor affidavit, dkt. # 62-17.

"[t]hey won't use the machine on him in back-to-back races . . . We have nothing to worry about." Id. The story also repeated Guillot's accusations about the Travers and explaining the Gaming Commission's ongoing investigation. Id. "We're still waiting," Guillot explained. Id. Investigators were "taking their sweet old time, but that's good for us. Otherwise, they would have already made an opinion." Id. On the eve of the 2013 Breeder's Cup Classic, the Louisville Journal Courier reported that Defendant had "apologize[d] to" D. Wayne Lukas, Will Take Charge's trainer, "as much as he's capable of." See Exh. Q to O'Connor affidavit, dkt. # 62-20. After the Racing Commission found Guillot's charges about the Travers unfounded, Guillot stated that "Mr. Lukas, I'd like to formally apologize on national TV[.]" Id. "The emotions got the best of me and I had a bad video. I tried to apologize to the kid (Saez) this morning. His agent got into it with me and wouldn't let me. I thought the coincidences looked obvious. I thought until five minutes before they told me that it was still true." Id. Still, the paper noted, "being Guillot, he concluded 'I'd do it all over again.'" Id. When asked if that meant he was apologizing for his comments, Defendant stated "[y]eah . . . I just did. (But) I'd do it all over again.'" Id.

### c. Analysis

Defendant offers several grounds for granting summary judgment on Plaintiffs' defamation claims. The Court will address them in turn.

#### i. Statements Concerning Plaintiff Horton

Defendant first argues that he did not make any statements of and concerning Plaintiff Horton. None of the statements outlined above mention Horton by name. As such, Defendant contends, Plaintiffs cannot prove any defamation directed at Horton. Plaintiffs respond that Defendant's accusations of use of an illegal device included the word "they,"

which clearly included Horton as the owner of the horse.  Defendant also referred to the Plaintiffs as "rats," which indicated that he directed his allegations at more than one person.  Moreover, in the racing industry, allegations about a horse are commonly understood as allegations against the owner as well.  A question of fact therefore exists as to the subject of the allegedly defamatory speech, Plaintiffs insist, and such question must be resolved by a jury.

"A statement is not [defamatory] unless it is 'of and concerning' the plaintiff." Dalbec v. Gentleman's Companion, Inc., 828 F.2d 921, 925 (2d Cir. 1987) (quoting New York Times v. Sullivan, 376 U.S. 254, 288 (1964)).  The statement is "of and concerning" the plaintiff when it "designates the plaintiff in such a way as to let those who knew [the plaintiff] understand that [he] was the person meant.  It is not necessary that all the world should understand the" defamation.  Id. (quoting Fetler v. Houghton Mifflin Co., 364 F.2d 650, 651 (2d Cir. 1966).  New York courts have held that "[i]t is not necessary that [the plaintiff] be named in the publication, if the allusion is apparent." Giamio v. Literaty Guild, 79 A.D.2d 817, 434 N.Y.S.2d 419 (1st Dept. 1981).  Instead, "'it is necessary, if it is to be held actionable as to him, that the language used be such that persons reading it will, in the light of the surrounding circumstances, be able to understand that it refers to the person complaining.'" DeBlasio v. North Shore Univ. Hosp., 213 A.D.2d 584, 624 N.Y.S.2d 263, 264 (2d Dept. 1995) (quoting Giaimo, 79 A.D.2d at 917).  "The question is not so much who was aimed at, as who was hit."  Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 63-64, 126 N.E. 260, 262 (1920).  In defamation cases, the question of whether the allegedly defamatory statement refers to a plaintiff is generally "one for the determination of the jury." Bridgwood v. Newspaper PM, Inc., 276 A.D. 858, 93 N.Y.S. 2d 613, 614 (2d Dept. 1949); see also, Bee

- 7 -

Publications v. Cheektowaga Times, 107 A.D.2d 382, 385, 485 N.Y.2d 885, 888 (4th Dept. 1985) ("Under the usual rule in cases where a plaintiff is not named in a publication it is for the jury to determine whether the 'of and concerning' requirement of the cause of action has been met.").

The Court will deny the motion in this respect. As outlined above, Guillot's comments included at least one instance when he referred to the alleged use of the device to shock Will Take Charge as the actions of "they," and not just of the individual jockey, Plaintiff Saez. A jury could reasonably conclude that the "they" to which Guillot referred included the owner of the horse, and that people in the horse-racing community would have interpreted Guillot's accusations to include Plaintiff Horton. A horse-racing operation is not huge, and the small group of people involved in putting Will Take Charge on the track, including Plaintiff Horton, could easily be seen to be among those to whom Guillot referred. Indeed, "[w]hen a defamatory matter refers to a small group of persons, an individual member may recover if (1) the group or class is so small that the matter can reasonably be understood to refer to the member, or (2) the circumstances of publication reasonably give rise to the conclusion that there is a particular reference to the member." Handelman v. Hustler Magazine, Inc., 469 F.Supp. 1048, 1050 (S.D.N.Y. 1978) (citing RESTATEMENT (SECOND) OF TORTS, § 564A, Comment B, Illustration 3 (1977)). Moreover, when Defendant later apologized for his accusations, he apologized to D. Wayne Lukas, the horse's trainer, who he had not accused in his complaint. A jury could use this statement to conclude that "they" included not only Saez and Lukas, but Plaintiff Horton as well.

### ii. Whether Plaintiffs Are Public Figures

Defendant next argues that Plaintiffs are public figures and that they therefore must demonstrate "actual malice" to prevail on their defamation claims. Wilsey v. Saratoga Harness Racing, 140 A.D.2d 857, 858, 528 N.Y.S.2d 688, 690 (3d Dept. 1988). "Public figures include those who assume roles of especial prominence in the affairs of society." Id. Proving actual malice "requires a public figure to prove by clear and convincing evidence that a defamatory statement was published with 'knowledge that it was false or with reckless disregard of whether it was false or not[.]'" Stepanov, 120 A.D.3d at 37 (quoting Kipper v. NYP Holdings Co., Inc., 12 N.Y.3d 348, 353, 912 N.E.2d 26 (2009)). That inquiry is a "subjective" one, "'focusing on the state of mind of the publisher of the allegedly libelous statements at the time of publication.'" Id. (quoting Kipper, 12 N.Y.3d at 354-355). People "who 'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" can be "'limited purpose' public figures[.]" Huggins v. Moore, 94 N.Y. 2d 296, 301-302, 726 N.E.2d 456, 459 (1999) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974)). Professional athletes "are often public figures" under this standard. Wilsey, 140 A.D.2d at 858.

Defendant contends that both Plaintiffs are public figures. Plaintiff Saez, Defendant argues, is a public figure because, as a jockey, it is normal for him to be interviewed by the media following a race, and he has been trained to speak in front of people and the press.

"The category of 'public figures' is of necessity quite broad. Included, without doubt, are many types of public figures such as professional athletes, nightclub and concert singers, television and movie actors, and recording artists." James v. Gannett Co., 40

- 9 -

N.Y.2d 415, 422, 386 N.Y.S.2d 871, 879 (1976). Even if those persons do not "necessarily take an active part in debates on public issues," the public still mains a "continuing interest" in them. Id. Courts have identified a "critical consideration" as whether the plaintiff "had taken affirmative steps to attract personal attention or had strived to achieve a measure of public acclaim." Maule v. NYM Corp., 54 N.Y.2d 880, 881-82, 495 N.E.2d 416, 417 (1981).

The Court finds that Plaintiff Saez is a limited purpose public figure. As a prominent jockey participating in nationally televised horse races who has granted interviews to reporters before and after events, he has thrust himself into the public discussion on issues related to that sport and on the Travers Stakes. See Wilsey, 140 A.D. 2d at 858 (finding a prominent harness-track driver a public figure because his "position is akin to a professional athlete or entertainer. He is a licensed harness track driver who drove regularly at defendants' track" for a number of years, and was highly ranked, admitted to expertise in the field and a public recognition in a sport with "significant interest" among the public, and had commented in newspapers and on television about the controversy in question).

Plaintiffs do not really dispute that Saez could be considered a limited purpose public figure. They challenge Defendant's assertion, however, that Horton is a public figure. Plaintiff Horton is also a public figure, Defendant argues, because he owns the horse in question, and that horse competed in high-profile races such as the Breeders Cup, the Kentucky Derby, and the Travers, Preakness and Belmont Stakes. Plaintiffs contend that Defendant Horton cannot be considered a public figure simply because he owns a race horse.

The Court agrees with Defendant that Horton should be considered a limited purpose public figure. The mere fact that Plaintiff Horton owned a race horse who ran in

N.Y.2d 415, 422, 386 N.Y.S.2d 871, 879 (1976). Even if those persons do not "necessarily take an active part in debates on public issues," the public still mains a "continuing interest" in them. Id. Courts have identified a "critical consideration" as whether the plaintiff "had taken affirmative steps to attract personal attention or had strived to achieve a measure of public acclaim." Maule v. NYM Corp., 54 N.Y.2d 880, 881-82, 495 N.E.2d 416, 417 (1981).

The Court finds that Plaintiff Saez is a limited purpose public figure. As a prominent jockey participating in nationally televised horse races who has granted interviews to reporters before and after events, he has thrust himself into the public discussion on issues related to that sport and on the Travers Stakes. See Wilsey, 140 A.D. 2d at 858 (finding a prominent harness-track driver a public figure because his "position is akin to a professional athlete or entertainer. He is a licensed harness track driver who drove regularly at defendants' track" for a number of years, and was highly ranked, admitted to expertise in the field and a public recognition in a sport with "significant interest" among the public, and had commented in newspapers and on television about the controversy in question).

Plaintiffs do not really dispute that Saez could be considered a limited purpose public figure. They challenge Defendant's assertion, however, that Horton is a public figure. Plaintiff Horton is also a public figure, Defendant argues, because he owns the horse in question, and that horse competed in high-profile races such as the Breeders Cup, the Kentucky Derby, and the Travers, Preakness and Belmont Stakes. Plaintiffs contend that Defendant Horton cannot be considered a public figure simply because he owns a race horse.

The Court agrees with Defendant that Horton should be considered a limited purpose public figure. The mere fact that Plaintiff Horton owned a race horse who ran in

high-profile events is not enough to make him a limited-purpose public figure; if he had been an absentee owner who simply signed checks and allowed others to be the public face of the operation, the Court may well have concluded that he had not injected himself into the controversy and publicity surrounding the Travers Stakes and other major horse races. Here, however, Horton testified at his deposition that newspaper and television reporters frequently interviewed "owners, jockeys [and] trainers" after races. See Deposition of Willis Horton, Exh. H. to O'Connor Affidavit, dkt. # 62-9, at 21. Horton had been "interviewed by reporters over the years." Id. He granted interviews to reporters for horse-racing publications as well as "the track people" following the Travers Stakes. Id. at 23. Since Plaintiff Horton admits that he involves himself in the public controversies and publicity surrounding horse racing in general and the Travers Stakes in particular, the Court finds that Horton has "taken affirmative steps to attract personal attention or . . . strived to achieve a measure of public acclaim." Maule, 54 N.Y.2d at 881-82. The Court will therefore apply the heightened standard that applies to defamation against public figures for both Plaintiffs.

### iii. Actual Malice

Defendant contends that Plaintiffs have failed to produce evidence of the actual malice that would make his statements regarding them defamatory. To prove actual malice, a plaintiff must provide "proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of . . . its truth or falsity." Celle v. Filipino Reporter Enters., 209 F.3d 163, 183 (2d Cir. 2000). This "standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication." Church of Scientology Int'l v. Behar, 238 F.3d 168, 174 (2d Cir. 2001). Proof of knowledge of falsity is not necessary, but

- 11 -

if a plaintiff relies on evidence of reckless conduct, that plaintiff must provide "sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" Id. (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)). A plaintiff can prove actual malice "'through the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence[.]'" Celle, 209 F.3d at 183 (quoting Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1293 (D.C. Cir. 1988)). "Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice." Id. "[W]hether actual malice can plausibly be inferred will depend on the facts and circumstances of each case." Biro v. Condé Nast, 807 F.3d 541, 545 (2d Cir. 2015). The "existence of malice is usually a question of fact," but "the issue is one for a jury only if the plaintiff provides evidence warranting such submission." Kaplan v. McNamara, 116 A.D.2d 626, 627, 497 N.Y.S.2d 710, 712 (2d Dept. 1986). In the end, "[w]hatever evidence is relied upon, actual malice must be supported by clear and convincing proof." Celle, 209 F.3d at 183.

Defendant argues that Plaintiffs have no evidence of actual malice. The evidence shows only that Guillot reported what he felt was a rules violation to the Gaming Commission, and that the Gaming Commission investigated the complaint. In newspaper articles, Guillot expressed a belief that his statements were true, and believed they were true when he uttered them. Plaintiffs contend that they have produced evidence that Defendant acted out of professional rivalry, motivated to have his horse declared winner of a prestigious race. Defendant also proved reckless about the truth, making his accusations in the press

when the Racing Commission was still investigating the matter.  He also continued his recklessness after the investigation concluded and cleared Saez, telling members of the press that he would make the same accusations even with that knowledge.  Such allegations were especially egregious because continuing to make them after them after the investigation served only to damage Plaintiff's Saez's reputation.

Defendant testified that, while disappointed at losing a million-dollar race, he did not feel that anything illegal had happened when Will Take Charge passed Moreno at the end of the race.  See Deposition of Eric Guillot ("Guillot Dep."), Exh. D to Affidavit of Ralph DiSimone, dkt. # 72-5, at 38-39.  He only began to suspect improper conduct after his brother told him he saw something suspicious on a video of the race that his brother saw after returning home to Louisiana.  Id. at 40.  After watching the tape himself, Guillot concluded that Saez's actions appared "very suspicious with all his movement in his hands." Id. at 42-43.  He filed a formal complaint after sharing the video with Moreno's owner and speaking to him about the situation.  Id. at 43.  The formal complaint alleged that his brother had viewed a video from NBC Live on a large plasma-screen television, and that "it was obvious the kid had trouble celebrating because of [a] black device in [his] right hand switching to left hand and tucking under [the] left shoulder under [the] saddle pad."  Id. at 48. Guillot then spoke to the press, making some of the statements that are the subject of this lawsuit.  Id. at 55-57.  After speaking to the press and making his initial accusations to reporters, Defendant showed the video to a number of people "to see their opinion, what they thought, if it was–if they saw the same thing."  Id. at 56.  He did not seek anyone else's opinion before speaking to the press.  Id. at 57.  The investigation into the charges was not complete when he made his statements to the press.  Id. at 63.  As explained above, Guillot

repeated these allegations after the Racing Commission determined them unfounded, stating that while he apologized, he would make them again.

The Court will deny the motion in this respect as well.  Considering all of the facts and circumstances of the case, the Court finds that a reasonable juror could conclude that Defendant, motivated by animosity towards an operation that had beaten a horse he trained, repeatedly accused Plaintiffs of cheating in the Travers Stakes "with reckless disregard of the truth or falsity" of that claim.  <u>Celle</u>, 209 F.3d at 183.  Jurors could find that making such allegations in the press during the pendency of an investigation, repeating those allegations after the investigation found the claims unfounded, and stating that he would make such claims again even after investigators dismissed them, represented a reckless disregard for the truth or falsity of his claims.  Defendant may well convince a jury that he was motivated only by a desire to promote clean racing, but the issue of actual malice is a question of fact to be resolved by that jury.

### iv. Privilege

Defendant also argues that he is entitled to a qualified privilege for his statements, regardless of whether they could be considered defamatory.  "Even though a statement is defamatory, there exists a qualified privilege when the communication is made to persons who have a common interest in the subject matter."  <u>Foster</u>, 87 N.Y.2d at 751.  "Generally, a statement is subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral or in the conduct of his own affairs, in a matter where his interest is concerned.'"  <u>Thomas H.</u>, 18 N.Y.3d at 586.  The privilege applies "when a person makes a good-faith, bona fide communication upon a subject in which he or she has a shared interest, or a legal, moral or societal interest to speak, and the communication

is made to a person with a corresponding interest.'" Cusimano v. United Health Servs. Hosps., Inc., 91 A.D.3d 1149, 1150, 937 N.Y.S.2d 413, 416 (3d Dept. 2012) (quoting Lerwick v. Krna, 29 A.D.3d 1206, 1208, 815 N.Y.S.2d 767 (2006)). "The defense of qualified privilege will be defeated by demonstrating a defendant spoke with malice" or "where the motivation for making such statements was spite or ill will (common-law malice) or where the 'statements [were] made with [a] high degree of awareness of their probable falsity.'" Foster, 87 N.Y.2d at 751-2.

Defendant's argument here is that his initial statements, which were to the Gaming Commission, were protected by this privilege. He admits he made additional statements to the press, but contends that he did not approach the press, did not inform the press that a complaint had been made, and was never told he could not discuss the matter with the press. Therefore, his statements are protected by the privilege. Defendant offers no case law to support the proposition that the qualified privilege, if applicable during a conversation with one person or body, must be applied to a conversation with a different person or body. Defendant offers no argument that a conversation with the press itself would qualify for the privilege, but simply attempts to extend the privilege that applies to statements to the Gaming Commission to statements to the press. The Court rejects that argument. The conditional privilege has been termed a "common interest privilege[.]" Liberman v. Gelstein, 80 N.Y.2d 429, 437, 605 N.E.2d 344, 349 (1992) (internal quotations omitted). That privilege has applied "to employees of an organization, members of a faculty tenure committee and constituent physicians of a health insurance plan." Id. (internal citations omitted). Courts apply this privilege because "so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded." Id. Here, Defendant

offered comment when approached by the press, and Plaintiffs argue that such comments was defamatory. Assuming that they could convince a jury that such comments defamed them, the mere fact that other comments made to the Gaming Commission–which Plaintiffs admit cannot be the subject of a defamation suit–are protected by privilege does not protect comments made to other people and in another context. The motion will be denied in this respect too.

### v. Opinion

Finally, Defendant argues that his statements amount to opinions, and cannot be the subject of a defamation claim. "Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." Mann v. Abel, 10 N.Y.3d 271, 276, 885 N.E.2d 884, 885- 886 (2008). Whether a statement is a fact or opinion is a question of law. Id. The difficulty in identifying the difference factual assertions and opinions has caused courts to consider a number of factors: "'(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely be opinion, not fact.'" Brian v. Richardson, 87 N.Y.2d 46, 51, 660 N.E.2d 1126, 1129 (1995) (quoting Gross v. New York Times Co., 82 N.Y.2d 146, 153, 623 N.E.2d 1163 (1993) (internal quotations omitted)). Courts are to "consider the content of the communication as a whole, as well as its tone and apparent purpose." Id. A court need not "sift through a communication for the purpose of isolating and identifying assertions of fact," but rather "should look to the over-all context in which the

assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts about the . . . plaintiff.'" Id. (quoting Immuno AG v. Moor-Jankowski, 77 N.Y.2d 235, 254, 566 N.Y.2d 906 (1991)). The court must also consider "the larger context in which the statements were published, including the nature of the particular forum." Id.

Defendant contends that the statements related above are non-actionable opinions. In speaking with the press, he argues, he was merely relating what he alleged in the complaint to the Gaming Commission; "Defendant Guillot did not solicit these interviews and he merely responded to questions based on his opinion of what the video portrayed." Readers of these statements would likely take them as opinions, not facts, he contends. The Court rejects this argument. Reading the statements complained of in context, the Court finds that those statements would likely be understood by readers as relating a particular fact: that Plaintiffs used an illegal device to stimulate Will Take Charge in the Travers Stakes. Such a statement is not an opinion, but a statement of fact. That statement could be proved true or false, and a person hearing the opinion in context would understand the claim to be one of fact, not simple opinion. The Court will therefore deny the motion in this respect as well.

### vi. Conclusion as to Summary Judgment

For the reasons stated above, the Court will deny the Defendant's motion for summary judgment in all respects.

### B. Expert Testimony

Defendant also moves to preclude the testimony of Plaintiff's rebuttal experts. The

parties have briefed that issue. Defendant argues that Plaintiffs' experts offer unreliable and speculative opinions which are not based on sufficient facts or reliable principles and methods and therefore must be excluded.

Defendant does not contend that the result of precluding the experts' opinions would be to eliminate the evidence necessary for a jury to find in Plaintiffs' favor. The Daubert motion instead goes to the evidence which may be produced at trial and is more properly a motion *in limine* than a motion to be brought at this stage of the case. The Court will therefore reserve ruling on the motion until the time of trial.

## IV. Conclusion

For the reasons stated above, Defendant's motion for summary judgment and to preclude the testimony of Plaintiffs' rebuttal experts, dkt. # 62, is GRANTED in part and RESERVED in part. The motion for summary judgment is DENIED. The motion to preclude the testimony of Plaintiffs' rebuttal experts is RESERVED.

IT IS SO ORDERED.

Dated: August 23, 2016

_____
Thomas J. McAvoy
Senior, U.S. District Judge